MONTGOMERY SPECIAL TERM, October, 1848.
*Harris*, Justice.

## BANDER *vs.* SNYDER.

The farm of S. being about to be sold under a decree of foreclosure in favor of H. for about $430, he applied to B. for assistance to pay the mortgage debt. B. advanced the money, and took an assignment of the bond and mortgage and the decree of foreclosure, in order to prevent a sacrifice of the mortgaged premises. A sale took place, under the decree, at which B. became the purchaser of the farm, at a bid of $680, S. acquiescing in the sale, under the belief that his interest in the premises was not to be affected by it. B. purchased the property with the intention of holding it merely as security for his advances, and under an agreement with S. that S. should be entitled to the benefit of a resale. B. paid nothing on account of the premises, except the $130 paid to H.; the balance of the $680 bid by him, at the sale, remaining unpaid. *Held* that the agreement between the parties, being a parol agreement relating to lands, was void by the statute of frauds. And that B., having obtained the legal title, by the sale under the decree of foreclosure, was under no legal obligation to hold the premises for the benefit of S.; but that he was entitled to claim, as his own, the difference between the amount which he had paid, and the amount received by him for the farm, upon a subsequent sale thereof.

*Held also*, that if B. elected to avail himself of his legal right to be considered as the purchaser of the mortgaged premises, on his own account, he must be held responsible for at least the amount of the purchase money, viz. the sum bid by him at the sale under the decree of foreclosure.

Where fourteen years have been suffered to elapse between the time when the last payment upon a bond and mortgage became due, and the commencement of a suit to foreclose the mortgage, that fact, in connection with other circumstances tending to prove payment, will be sufficient to warrant the presumption that the bond and mortgage have been paid.

IN EQUITY. The bill in this cause was an ordinary bill of foreclosure. It alleged that on the 7th day of April, 1828, the defendant executed and delivered to the plaintiff, his bond, conditioned for the payment of $375 with interest—$100, with interest upon the whole sum, to be paid on the first day of April, 1829, and the remaining $275 to be paid in one year thereafter, with interest—and at the same time, to secure the payment of the moneys mentioned in the condition of the bond, the defendant executed to the plaintiff a mortgage upon a piece

of land in the county of Montgomery, which mortgage was duly recorded on the 20th of July in the same year. The plaintiff claimed that the whole amount of the bond and mortgage remained due and unpaid.

The defendant answered without oath. He admitted the execution of the bond and mortgage, but alleged that they were given to indemnify the plaintiff for having signed a note as security for the defendant, to William Tunnecliff, for $375; of which sum $250 was for money borrowed of Tunnecliff by the defendant, and the balance was for whiskey purchased of Tunnecliff at the same time, and sold to Jacob and John Henry Harder, and for which the Harders were to pay, when the note to Tunnecliff became due. The answer further alleged that the plaintiff, being indebted to the Harders to the amount of $125, for which they held his note, requested the defendant to take up that note, by discharging his claim against the Harders for the whiskey, and agreed, in case the defendant should do so, to pay that amount upon the note to Tunnecliff. That the defendant accordingly took up the plaintiff's note to the Harders, and thereby the plaintiff became bound to pay $125 of the note to Tunnecliff. It was further stated, in the answer, that some time in the year 1829, one Jabez D. Hammond, having a bond and mortgage against the defendant, which he was proceeding to foreclose, and the mortgaged premises, consisting of a farm in the town of Stark in the county of Herkimer, worth at least $1000, being about to be sold under a decree of foreclosure which had been obtained by Hammond, the defendant applied to the plaintiff for a loan sufficient to pay the amount due Hammond, which was about $430, but upon consultation it was agreed that the plaintiff should attend the sale and bid off the farm, and take a deed for it in his own name; that the defendant should have the privilege of selling the farm, and out of the proceeds the plaintiff should only receive the amount paid to Hammond with interest, and that the defendant should be entitled to the surplus; that the plaintiff was also to retain, out of the surplus, the balance of the Tunnecliff note; that the sale took place, and the plaintiff became the purchaser for the

sum of $680 ; that he paid Hammond about $430, and paid nothing more; that the defendant, in 1832, negotiated and consummated a sale of the farm to one Conyne for $1000, and the plaintiff received of Conyne the whole amount of the purchase money, but had never in any way accounted for it. It was further stated that, after the purchase of the farm by the plaintiff, it was agreed, between him and the defendant, that the defendant should continue to occupy the farm, and the plaintiff should have one half of the produce ; that subsequently the plaintiff proposed to the defendant that if he would surrender the possession of the farm to his son, he would allow him $25 for the fall ploughing, and apply that amount upon the Tunnecliff note ; that the proposition was accepted and the plaintiff's son took possession of the farm. The answer further stated that the defendant had an account against the plaintiff from and since 1831, for work, labor and services, and materials found, for the plaintiff, amounting to about $250, which ought to be applied in payment of the plaintiff's bond and mortgage, and some additional claims consisting of notes and accounts. The plaintiff put in a replication to the answer, and proofs were taken by the parties. The cause was brought to a hearing upon pleadings and proofs.

*H. Adams,* for the plaintiff.

*P. G. Webster,* for the defendant.

HARRIS, J. Whether the bond and mortgage were executed by the defendant to secure the plaintiff against his liability as surety for the defendant upon the note to Tunnecliff, or for an indebtedness of the defendant to the plaintiff, it is not very material to determine. It is not denied that the bond and mortgage became, when executed, a valid security in the hands of the plaintiff. If they were in fact given for the purpose stated by the defendant, it is not pretended that the Tunnecliff note was paid by the defendant, or that it was not in fact paid by the plaintiff. In the examination of the case, I shall, therefore,

assume that the bond and mortgage were originally a valid security in the hands of the plaintiff, for the amount mentioned in the condition.

The defendant alleges, that the first instalment which became due upon the bond and mortgage was in fact paid to the plaintiff, by taking up his note to the Harders for the same amount. I think this branch of the defence is supported by the proof. It appears that the defendant, when borrowing $250 of Tunnecliff, also purchased of him whiskey to the amount of $125. The purchase was probably made, as a condition of the loan. The whiskey was sold to the Harders. Subsequently the plaintiff became indebted to them in the same amount for which he had given his note. The defendant received from them that note in satisfaction of the amount due for the whiskey. Thus, in effect, the defendant, by paying the plaintiff's debt to the Harders, paid the plaintiff the amount of the first instalment upon the bond and mortgage.

Henry Murphy testified that the plaintiff had told him that he had received the money for the whiskey. Aaron Snyder also testified that, in the fall of 1843, the plaintiff told him the defendant had taken up his note to the Harders, and had given it up to him, and that he was to endorse the amount of it upon the mortgage. It is true that an attempt was made, and not without success, to impeach the character of these witnesses, especially the latter. But it appears from the evidence in the case, that Harder was residing in the county of Niagara, and might have been examined to disprove the facts in respect to which these witnesses speak, if untrue. I cannot, therefore, but regard this circumstance as sustaining, to some extent, their testimony. And, besides, it is proved by James G. Snyder, who is wholly unimpeached, that, between one and two years before he was examined, he had been requested by both the plaintiff and the defendant, to write to Harder to ascertain the amount of the whiskey note; that the only difference between the parties was in respect to the amount of the note, the plaintiff alleging that it was but $125, and the defendant insisting that

it was $150.    I therefore regard this branch of the defence as fully sustained.

The next ground upon which the defendant relies, relates to the purchase of the Hammond mortgage by the plaintiff, and his subsequent purchase of the mortgaged premises at the master's sale.    It appears that Judge Hammond held a mortgage upon a farm in Stark, in the county of Herkimer, executed by the defendant, which he was proceeding to foreclose.    A decree for the sale of the mortgaged premises had been obtained, and the sale had been advertised.    The defendant applied to the plaintiff to advance the money to pay off the mortgage.    They went together to see Hammond.    While there, the plaintiff agreed to make the advance.    Various modes of security were suggested, but it was finally agreed that the plaintiff should take an assignment of the mortgage.    Accordingly, on the 19th of May, 1829, the plaintiff paid Hammond $430,92, and received from him an assignment of his bond and mortgage, and the decree against the defendant.    On the 15th of June following, the premises were sold by a master in chancery, under the decree.    The plaintiff attended the sale and became the purchaser.    It appears from the master's deed, which is made an exhibit, that the amount of his bid at the sale was $680.    No report of sale was produced on the hearing, and upon inquiry at the proper office, I have learned that none was ever in fact filed.    It does not, therefore, appear from the records, whether the surplus arising from the sale was ever actually paid, or if paid, by whom it was received.    The decree itself, which is also made an exhibit, contains a provision that the surplus may be paid to the defendant.

I am satisfied from the evidence in the case, that the plaintiff, as well as the defendant, understood that the title acquired at the master's sale should be held merely as security for the amount advanced by the plaintiff.    Aaron Snyder testified that on the morning of the day of sale, the plaintiff came to his father's, on his way to Little Falls, where the sale was to take place; that his father proposed to the plaintiff to go with him, and the plaintiff replied that there would be no use in his

going, that he would take his son Peter Bander with him, and would bid off the place, and afterwards they would make it right between them—that all he wanted was the money he had paid Judge Hammond, and the interest—that each should endeavor to sell the farm, and if it could be sold for more than the amount paid by the plaintiff, the excess should belong to the defendant. The same witness states that after the sale he heard the plaintiff say that he had bid $670, or $680 ; that he should not have been obliged to run up the place so high, at the sale, if it had not been for William Borland, and that he would have had to bid still higher, if he had not demanded the specie. Murphy also testified, that after the sale, the plaintiff told him he had bid off the farm for the defendant; that it would not have come so high as it did, had it not been that William Borland bid it up; that he further said he told Borland that he had come to bid off the farm for the defendant, and demanded specie, and then Borland bid no more. Murphy is the uncle of the defendant, and also of the plaintiff's wife. He was employed by the parties to draw the bond and mortgage, which is the subject of controversy in this suit. He was in the 84th year of his age when he testified. His connection with the parties would naturally account for the knowledge he professes to have of the transactions of which he speaks. And yet, he should perhaps be regarded as so far impeached by the witnesses who have testified as to his character, as to render it unsafe to rely upon his testimony, where he is not sustained by other evidence, or corroborated by circumstances. The same is more emphatically the case in respect to the testimony of Aaron Snyder, who is the defendant's son, and who was, at the time of some of the transactions of which he speaks, very young.

I proceed, therefore, to notice some other parts of the testimony, having perhaps some proper bearing upon this branch of the case. It appears that when the plaintiff purchased the farm, George Pelton occupied it, working it upon shares ; that the next year the income of the farm was divided between the plaintiff and the defendant, and that the succeeding year the

plaintiff's son went into possession and continued to occupy it until the spring of 1837, when it was sold to Cornelius Conyne. When the plaintiff took possession of the farm for his son, a question was made between the parties in relation to the fall ploughing, which had been done by the defendant, and it was agreed that Pelton and one Winegar should fix the amount that the plaintiff should allow the defendant for the fall ploughing. They fixed the amount at $25. Pelton also testified that in a conversation had with the plaintiff, three or four years before, he told him *that if the defendant would allow him what he had paid Hammond, and the interest, it was all he wanted.* Conyne testified that he negotiated with the defendant for the purchase of the farm; that after he had taken possession he found it very foul, and claimed of the plaintiff some allowance on that account; that the plaintiff told him he must look to the defendant, who had sold him the farm. Aaron Snyder also testified that in a conversation he had with the plaintiff in the fall of 1843, about the business between his father and the plaintiff, he said that all he wanted out of the money for which the farm was sold to Conyne, was the money he had paid to Hammond, and the interest; and in the same conversation he added that he and the defendant would settle their business, and if he owed the defendant he would pay him, and if the defendant owed him he could pay him; that they could settle their business better than any body else; that upon another occasion, about the same time, the defendant called to the plaintiff as he was passing, and told him he had received a letter from John Darrow stating that the bond and mortgage had been left with him for foreclosure; that the plaintiff said he did not know any thing about it; that it must have been done by his son Daniel, and that he would stop it; that they could settle their business better than the lawyers could; that the defendant then told him he had a good deal of his money in his hands, to which the plaintiff replied that he knew it, and that they would settle it themselves. Murphy further testified, that soon after the bond and mortgage was executed, he was requested by the plaintiff, when at his house, to look over

and see what there was between him and the defendant; that he gave him the mortgage and he cast the interest upon it; that he did not recollect what else there was between them; that, as nearly as he could recollect, there was a balance of between $30 and $50 in favor of the plaintiff. But I do not deem it necessary further to notice the testimony in detail.

The best examination I have been able to give the mass of evidence presented in this case, has resulted in the following conclusions: that the defendant, finding himself called upon to pay his bond and mortgage to Hammond, applied to the plaintiff, to whom he was related by marriage, and with whom he was on terms of intimacy, for assistance; that the plaintiff advanced the money and took an assignment of the bond and mortgage, and the decree of foreclosure, at the instance of the defendant, and to prevent a sacrifice of the mortgaged premises; that, notwithstanding this transfer, the sale was allowed to proceed, and the plaintiff became the purchaser, upon a bid of $680; that the defendant acquiesced in the sale, under the full belief that his interest in the premises was not to be affected by it; that the plaintiff also, in fact, purchased the premises with the intention of holding them merely as security for his advances, and under an agreement that the defendant should be entitled to the benefit of a resale; that after the plaintiff had acquired the title, the defendant cultivated the premises one year, dividing the crops with the plaintiff, and then the plaintiff himself took possession, and, through his son, occupied them until the spring of 1837, when the premises were sold to Conyne; that it was agreed between the parties that the plaintiff should receive the proceeds of the premises as an equivalent for the interest on his advances; that the only amount ever paid by the plaintiff, on account of the premises, was the sum of $430,92, paid to Hammond, and, perhaps, the master's fees upon the sale; that the balance of the $680, bid by the plaintiff at the sale, was never paid by him, to the defendant, or otherwise; that in April, 1837, the premises, through the agency of the defendant, were sold to Conyne for $1000, and the plaintiff received the whole amount of the purchase money;

Bander *v.* Snyder.

that the first instalment upon the plaintiff's bond and mortgage, with the exception, it may be, of a small amount of interest, was in fact paid, by means of the Harder transaction; that before the second instalment became due, the plaintiff had acquired the title to the other premises mortgaged to Hammond, and that from the time the last instalment upon the plaintiff's bond and mortgage became due, which was in April, 1830, until shortly previous to the filing of the bill in this cause, in June, 1844, the plaintiff made no claim upon the defendant for the payment of any amount due upon his bond and mortgage.

It only remains to determine the rights of the parties upon the facts thus established. So far as it relates to the title acquired by the plaintiff at the master's sale, I agree with the plaintiff's counsel, that the case is within the statute of frauds. Whatever the moral duty he owed the defendant, the plaintiff having obtained the legal title to the premises sold under the decree of foreclosure, was under no legal obligation to hold the premises for the defendant's benefit. It is true, he had agreed to do so; but the agreement was not in writing. And as it was an agreement relating to lands, it was within the statute for the prevention of frauds, then in force; a statute, the wisdom of which is evinced by the fact, that amid all the changes of more than 170 years, it has remained unchanged. Though he was enabled to obtain the title through professions of disinterested friendship, having obtained it, he had the legal right, if he chose to do so, to take advantage of the too great confidence of the defendant, and to claim, as his own, the difference between the amount which he had paid and the amount he received upon the sale of the farm. In respect to the morality of such a claim there could not well be a difference of opinion; but it is the policy of the law not to enforce an agreement, relating to lands, unless it be in writing; and, though injustice and hardship may be, and doubtless are, the result in many cases, those cases must yield to the enforcement of the general and salutary rule. (*See Hall* v. *Shultz*, 4 *John.* 240; *Sherrill* v. *Crosby*, 14 *Id.* 358.)

Bander *v.* Snyder.

But if the plaintiff elects to avail himself of his legal right to be considered as the purchaser of the mortgaged premises, on his own account, he ought not to complain if he is held responsible, at least for the amount of the purchase money. This amount exceeds, by a sum about equal to the amount unpaid upon the bond and mortgage sought to be enforced in this suit, the sum paid by the plaintiff to Hammond. There would probably be a small balance of interest in favor of the plaintiff. It may be that it was to this that Murphy referred, when he said he made the balance in favor of the plaintiff between $30 and $50. To any such balance, the sum of $25, which the plaintiff agreed to allow the defendant when he surrendered the possession of the farm, would be applicable. So that, in this view of the case, the bond and mortgage, upon which this bill is filed, must be considered as in fact paid. But if there could be any doubt upon this point, when regarding the testimony alone, such doubt can no longer be entertained, when the circumstances of the case are considered in connection with the fact that fourteen years were suffered to elapse between the time when the last payment upon the bond and mortgage became due, and the commencement of this suit. When the forbearance has continued twenty years, this alone is sufficient, of itself, to warrant the presumption of payment; and when connected with circumstances tending to prove payment, a shorter period will be sufficient. (2 *Phillips' Ev. Cowen & Hill's ed.* 171. 3 *Starkie's Ev.* 1090. *Cowen & Hill's Notes*, 316.) Having arrived at this conclusion, it is unnecessary to examine the evidence relating to the account upon which the defendant relies as a set-off. There must be a decree dismissing the bill with costs.